ODOM, Justice.
 

 Plaintiff brought' this suit for separation from bed and board on the ground of cruel treatment. She alleged that she and her husband were married on June 19,1923, and that they. lived together until October 4, 1930. She alleged especially that she had always conducted ’ herself properly, had given her-husband no cause or provocation for ill treatment, but that on the contrary she had always done all in her power to make her home comfortable and happy and that she had always been a faithful and dutiful wife. She alleged that notwithstanding all this her husband had on various occasions treated her cruelly, and that on October 3, 1930, he beat her with a strap, whereupon she abandoned him. She asked that she be awarded the care and custody of the four children of the marriage, their ages being given as two, three, five and six years.
 

 The husband filed answer and reconventional demand for separation, setting up that his wife “has been anything but a dutiful and loving wife,” and that she had been guilty of conduct which made their living together insupportable. He especially alleged that “on account of the ill temper, unreasonable conduct, neglect of household duties and acts of cruelty- on the part of his wife” toward him it has become impossible for them to live together; that she. “has cursed and abused him; has neglected the children of their marriage; has refused to attend to her duties as a housewife, leaving respondent and plaintiff in reconvention to procure his dinner * * * that plaintiff herein has heaped abuses upon your respondent and plaintiff in re-convention ; has cursed him on many, occasions within the hearing of others * ' * * that during the months of July, August and September, 1930, plaintiff spent no less than thirty days in New Orleans or Baton Rouge, leaving the children without proper care and not returning home from many of said trips until after the respondent and said children had retired for the night.”
 

 He alleged that on numerous occasions his wife had remained out until 11:30 at night, and that on one occasion when she returned home at that hour she found the doors locked and that “she proceeded to curse and abuse your respondent, calling him vile names, and that when your respondent unlocked the door to let her in, she pulled off her slipper and struck him in the face with it, bruising his skin and causing his face to be swollen for several days, and as respondent was returning to his room, she secured his shot-gun and advanced upon him, threatening to shoot him.”
 

 He reconvened, praying for judgment of separation of bed and board and for the care and custody of the minor children of the marriage.
 

 There was judgment.for plaintiff as prayed for, and defendant appealed.
 

 
 *797
 
 Plaintiff and defendant were married in June, 1923, and lived together until October, 1930. In her petition plaintiff avows that she has always conducted herself properly, had given her husband no cause or provocation for ill treatment, but on the contrary has done all in her power to make her home comfortable and happy and that she has been a faithful and dutiful wife.
 

 Notwithstanding all this, she says her husband has treated her cruelly on several occasions and finally, on October 3, 1930, severely beat her.
 

 We have read the record through and leave it thoroughly convinced that, instead of her having been “a faithful and dutiful wife,” she has failed on many points. We go further and say that as a witness she condemned herself by the words of her own mouth. From her own lips came a story which sets at naught her pretensions of faithfulness to duty as a wife and a mother.
 

 During the first years of their married life, this couple lived together peaceably, if not happily. Eater on, there was friction; they disagreed and quarreled. Then there were storms; they fought and finally separated. At the bottom of all this is the wife’s failure to appreciate and live up to the duties she owed to her husband, her home, and her children.
 

 For a number of years after plaintiff and defendant married, they lived in New Orleans, where defendant had employment at $165 per month. They decided to move to the country to save expenses. They built a home near the city and moved into it. The husband held his position in the city and went back and forth each day except Sundays. The wife says she agreed to this, first, because they could live in the country at less expense than in the city, and, second, because her husband had about $2,000 which she knew, or at least suspected, he intended to lend his brother and she did not want him to have it, and by using the amount to build, that much would be saved. The husband continued to work in the city and was apparently faithful to his home and his family. He came to his work each day, and as soon as that was over, he promptly returned, never being late.
 

 The wife began the habit and practice of leaving home early in the morning, coming to the city, remaining all day, and finally getting back home as late as 11:30 at night The reasons she gave for doing so were that she wanted'to visit friends and go to shows. These all-day trips and late returns became so frequent that her husband objected, not to her visits to the city, but to their frequency and the late hour, 11:30 p. m., at which she returned. When he admonished her, she says she informed him that it was none of his business when or where she went or when she returned. The husband and his sister, who lived next door to them, testified that during the three months next preceding the separation on October 4, the wife was away from home one-third of the time. One of the servants said she was away two or three days a week. The wife said that was an exaggeration, but admitted that “on several occasions” she had left home at 8:45 in the morning and remained away until 11:30 at night.
 

 When plaintiff was away from home, the four children, the youngest being about two and the oldest six years of age, were left in
 
 *799
 
 charge either of colored servants or defendant’s mother, usually with the servants. The husband arrived at home about 6 in the afternoons. When his wife was away, he had to take charge of the children, serve the evening meal, bathe and dress the children for bed.
 

 ,The wife’s visits to New Orleans and her late return at night became so frequent that her husband became very much displeased and irritated. He admonished her, calling her attention to her duties to the children and himself. She informed him that her conduct was none of his business. He finally told her that if she persisted in staying out so late at- night, she would find the doors locked when she reached home.
 

 On October 3, 1&30, she arrived home at 11:30 p. m. The outer doors were locked. She became infuriated and called him to open the door. She then proceeded to curse and abuse him. She says (page 94 of the record): “I called him a S. B. of a coward — I told him he was just a damned coward, and then I reckon I used damn, and hell — I don’t exactly remember, but I did curse him.” She then broke the door to the house and entered. She says her husband then proceeded to beat her with his leather belt.
 

 The husband admits that he “snapped his belt at her,” but says he did so because she came into the house in a rage of anger after cursing and abusing him in the manner testified to by her as already detailed. He says he “snapped his belt at her” to keep her away from him. She says she received bruises about the body, the evidences of which she carried for several days. Some four or five days later she yisited a physician, who testifled that he examined her body and found a few marks which indicated that she had received light blows, but these amounted to but little. She does not explain why she waited so long before seeing a physician. No treatment was administered.
 

 But the above is not the whole story. The facts are, and we take the wife’s own version of it, that the couple engaged in a fight, which was not a one-sided affair by any means. She says they were cursing each other, and admits that she hit him in the face with her shoe and scratched him, the result of which was that his face was disfigured. She said (page 93 of the record): “He did not come back that morning (the morning after the fight), his face was all scratched up, and he wasn’t able to go to work.”
 

 On that occasion she threw a cold-cream jar at him and missed. She went into an adjoining room, got a shotgun, returned to the scene, struck at her husband with it, but he warded off the blow, the gun striking the corner of a dresser.
 

 We extract the following from Mrs. Eaucheux’ testimony, page 92 of the record:
 

 “Q. Isn’t it true that on that night, you went to his bedroom door with a hammer, and hammered upon it, and told him you had something to settle with him? A. On October 3rd.
 

 “Q. Is that the night he jumped through the window? A. Yes. Later on I found he had.
 

 “Q. On .October 3rd he went through the window again? A. That is the only time he went through the window.
 

 
 *801
 
 “Q. I understand you to say that on a previous occasion, you did hammer on the door and tell him that you wanted to make a settlement with him, to discuss about your going to New Orleans, and Baton Rouge, and about locking the doors, and that he went through the window? A. That was on October 3rd.
 

 “Q. Then on October 3rd all this happened? A. Yes.
 

 “Q. And when you received your beating you say he went through the window that same night? A. He locked himself in his room after the beating.
 

 “Q. And then he went through the window? A. That was the only means of going out of the room that I could see, because the door was locked from the inside and the screen was unhooked and that is the way he went out.
 

 “Q. And you say he went out of the window? A. Yes, to his mother’s house on the 4th — that was the morning of the 4th.”
 

 Mrs. Paucheux says that all she did was in defense of herself. Her own testimony does not so impress us. She and her husband engaged in a real fight, and the record indicates that he got the worst of it, not because he is weaker physically than she, but because he did not want to hurt her. He is much stronger physically than she; but in order to get away from her, he left the house through a back window with his face so scratched and bruised that, according to her testimony, he was not able to go to his work the next day.
 

 Mrs. Paucheux thinks her husband’s protests against her conduct were unreasonable. We do not think so. He did not object to her visiting friends in New Orleans nor to her going to shows. What he objected to was that she was habitually neglecting him, her home, and their four young children, the youngest being two and the oldest being six years of age, by leaving home early in the mornings and remaining away until the dead hours of the night. It is perfectly clear that if this had happened only occasionally, nothing would have been said about it. But this practice had become a habit, so much so that the husband was driven to protest. He had a right to do so for the sake of the children, who needed and were entitled to the care and protection of their mother.
 

 Mrs. Paucheux is not entitled to a judgment of separation, she being, the offender. But her husband should have judgment in reconvention against her of separation from bed and board, and should be awarded the custody and care of the children of the marriage.
 

 Por the “reasons assigned the judgment appealed from is reversed, and plaintiff’s demands are rejected. It is further ordered that defendant, Lewis Paucheux, plaintiff in reconvention, have judgment of separation from bed and board against his wife, Mrs. Angel Paucheux, and that he be given the custody, keeping, and care of the children of the marriage, Meriam, Lewis, Jr., Laura Lea, and Thelma Paucheux